UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────

KATHRYN CATERNOLO,

               Plaintiff,

    -vs-

MICHAEL J. ASTRUE, Commissioner of
Social Security,

               Defendant.

**DECISION and ORDER
No. 6:11-CV-6601(MAT)**

─────────────────────────────────

## I.   Introduction

Represented by counsel, Kathryn Caternolo ("Plaintiff" or "Caternolo"), brings this action pursuant to Title II and Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Supplemental Security Income ("SSI") and disability insurance benefits ("DIB"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).

## II.  Procedural History

Caternolo filed applications for SSI and DIB on June 27, 2009, due to a severe migraine condition and back pain caused by a disc protrusion, alleging an onset date of June 15, 2009. (T.194, 198).[1]

---

[1]

Numerals in parentheses preceded by "T." refer to the pages of the administrative transcript, submitted as a separately bound exhibit in this action.

Caternolo stated that she was still in the process of obtaining a diagnosis for her pain,[2] which caused her to fall and prevented her from climbing stairs. Caternolo indicated that the migraines had become so severe and frequent that she was missing two to three days of work almost every week, leading to her termination from her job as an aide for a handicapped student. (T.198).

The applications were denied (T.70-77, 79), and on October 27, 2009, Caternolo filed a request for a hearing (T.84-85), which was held on October 4, 2010, before Administrative Law Judge ("ALJ") Barry Peffley ("the ALJ"). (T.36-69). The ALJ issued a written decision on November 4, 2010, finding that Caternolo was not disabled through the date of the decision. (T.17-26). The Appeals Council denied Caternolo's request for review on August 12, 2011 (T.4-7), making the ALJ's decision the decision of the Commissioner. This timely action followed.

## III. Factual Background

### A.    Medical Evidence

#### 1.    Back and Hip Pain

Radiographic studies on March 17, 2009, of Caternolo's lumbosacral spine revealed "[d]isc space narrowing" at all the lumbar discs, with degenerative osteophytes and Schmorl's nodes

---

[2]

Caternolo ultimately was diagnosed with bilateral hip osteoarthritis/osteoarthritis, which the ALJ found to be a severe impairment.

-2-

(protrusions of the cartilage of intervertebral discs). (T.267). Degenerative change was present at the superior endplate of T12. (Id.). The impression was moderate degenerative disc changes. (Id.).

Caternolo underwent a spinal MRI on May 27, 2009, which revealed that her lumbar disc spaces were all mildly to moderately narrowed, with dessication and mild circumferential bulges at all the lumbar discs. (T.269). A focal left paracentral protrusion was impinging upon the dural sac and the emerging left S1 nerve root in the lateral recess. (Id.).

On June 25, 2009, Caternolo sought treatment from orthopedist M. Gordon Whitbeck, Jr., M.D. for pain in her low back, left groin, and thighs which she attributed originally to a motor vehicle accident as a teenager. (T.288). Then, in 2006, while lifting her 6-year-old child, the pain suddenly became worse, extending into her anterior and posterior thighs. Sitting cross-legged on the floor and pivoting on her legs caused the pain to worsen, but none of the symptoms extended past her knees. Chiropractic treatments had not helped.

Dr. Whitbeck found no tenderness in her lumbar spine, although bilateral hip examination revealed pain. Caternolo described pain in her groin radiating down her anterior thigh to her knee as well as discomfort in her buttocks and posterior thigh. (T.289). After reviewing the May 2009 MRI, Dr. Whitbeck opined that Caternolo did

not have typical radiculopathy associated with her degenerative disc disease. He diagnosed bilateral atypical sciatica with lower back and hip pain. Dr. Whitbeck referred Caternolo to Frederick Kaempffe, M.D. for further evaluation of her hip pain.

On July 29, 2009, Caternolo consulted with Dr. Kaempffe, whose examination revealed that Caternolo walked with a "waddling" gait with pain at the extremes of hip rotation, worse on the right side. (T.292). Dr. Kaempffe's diagnosis was bilateral hip osteoarthrosis, for which he recommended intra-articular cortisone injunctions in both hips. (Id.). Caternolo received steroid injections at Dr. Kaempffe's office on August 4, 2009, and August 17, 2009. (T.293, 295).

When Caternolo saw Dr. Kaempffe in follow-up on August 17, 2009, she reported that the cortisone injections had "only minimally helped." (T.295). Dr. Kaempffe noted that Caternolo walked with a limp, her right extension was 5 degrees, abduction was 30 degrees, adduction was 5 degrees, internal rotation was 10 degrees, and external rotation was 30 degrees. (Id.). Dr. Kaempffe found that Caternolo had "pain with extremes of hip motion", a "subjective catching sensation", and, on the right side, "crepitance [crackling] with motion". (Id.). Dr. Kaempffe's diagnosis remained bilateral hip osteoarthrosis. (Id.). Due to Caternolo's ongoing symptoms and pain, Dr. Kaempffe decided to go

-4-

ahead with blood work to rule out an inflammatory disease process. (Id.).

Caternolo was referred to the allergy/immunology/rheumatology clinical group at Strong Memorial Hospital to rule out rheumatoid arthritis as a cause for her widespread stiffness, neck pain, facial pain, hip pain, and difficulty with ambulation. (T.322). She had had a marginally elevated rheumatoid factor in August 2009, but results of the blood work ordered by Ralf Thiele, M.D. on January 22, 2010, showed a negative rheumatoid factor. (T.322-23). On December 9, 2009, radiologists found no radiographic evidence of osteoarthritis or rheumatoid arthritis in Caternolo's hands. (T.329).

### 2.   Migraines

On March 25, 2009, Caternolo presented at the office of neurologist Darrick J. Alaimo, M.D. for evaluation of her chronic severe headaches, which had begun in her 20s. (T.271, 276-78). Since September of 2008, they had increased in frequency and severity; Caternolo stated that she was experiencing them weekly, and some lasted up to 3 days. The headaches usually occurred in the temple area or around her eyes and nose, and consisted mainly of pounding, sharp, or "hot poker"-type pains. The headaches caused nausea, vomiting, photophobia and phonophobia. Caternolo also described painful tingling in her face following a bout of shingles on her right chin in May of 2006. Dr. Alaimo diagnosed Caternolo as

suffering from migraine prodome, common migraine headaches, and post-herpetic neuralgia on her face. He prescribed a regimen of Imitrex (for the migraines), Reglan (for nausea), and gabapentin (for post-herpetic neuralgia).

On April 13, 2009, Caternolo consulted with gastroenterologist Mark Pereira, M.D., complaining of increasing abdominal symptoms over the past four months, coincident with increasing migraines. (T.283). Dr. Pereira diagnosed Caternolo as suffering from irritable bowel syndrome and food allergies, and attributed the nausea and vomiting to her migraines. (Id.).

On June 7, 2010, Caternolo saw neurologist Eugene A. Tolomeo, M.D., and explained that her migraine headaches were occurring once or twice a week and lasting for 24 to 72 hours. (T.333). Dr. Tolomeo diagnosed Caternolo as suffering from "[m]igraine with aura, with intractable migraine . . . without mention of status migrainosus" and post-herpectic trigeminal neuralgia. (T.334). Dr. Tolomeo prescribed Imitrex and Depakote for the migraines, Promethazine suppositories for the nausea, and gabapentin for the post-herpetic neuralgia. (T.334).

### 3.   Allergies

Caternolo sought treatment in June 24, 2009, for her allergies and recurrent sinus infections. Dr. Krishna Persaud diagnosed Caternolo as suffering from seasonal allergic rhinoconjunctivitis, possible food allergies by history, and possible multiple insect

allergies. (T.241). Caternolo was prescribed Zyrtec for the allergy symptoms and Ultram (tramadol) for pain. (T.241).

### 4.   The Consultative Physician's Report

On October 5, 2009, consultative physician Harbinder Toor, M.D., examined Caternolo at the behest of the Commissioner. (T.301-04). Caternolo related pain in her hips, which Dr. Toor described as bursitis, for many years. She stated the pain in her hips was "constant", "sharp", and an "8" on a scale of 1 to 10. (T.301). She had last had a migraine about two weeks prior to the consultative examination. (T.301).

Dr. Toor found that Caternolo was "in moderate pain in the hips and back", had a normal gait but had "difficulty walking on the heels and toes", and could squat halfway. (T.301). She had "difficulty getting on and off [the] examination table because of pain in the hips" but needed no help changing for the exam and was able to rise from the chair without difficulty. (T.301).

Dr. Toor noted that Caternolo's activities of daily living were "[c]ooking every day. Cleaning every day. Laundry every day. Shopping three days a week. Childcare daily. . . . No outing and no sports, no socializing, no hobby." (T.302). She stated that she watches TV, listens to the radio, and likes reading. (Id.).

Dr. Toor's examination of Caternolo's lumbar spine showed flexion to 30 degrees, rotation to 30 degrees, lateral flexion to 30 degrees, and extension to 0 degrees, accompanied by pain in her

back. (T.303). Caternolo declined the supine straight-leg raising test. Although she "ha[d] pain in the hips" and "tenderness in the hips bilaterally," the movements were "normal and full in the hips." (Id.). Caternol had full range of motion in her shoulders, elbows, forearms, wrists, knees, and ankles bilaterally. (Id.). Her joints were stable with no redness or swelling, and strength was 5/5 in her upper and lower extremities. (Id.). Hand and finger dexterity were intact, and her grip strength was 5/5 bilaterally. (Id.).

Dr. Toor diagnosed Caternolo as having a history of the following ailments: arthritis; severe allergies/anaphylaxis; severe migraines; shingles; pain in her eyes, ears, jaw, and nose (post-herpetic neuralgia); lumbar disc disease; and bursitis of the hips. (T.304). Dr. Toor stated that her prognosis was "[f]air." (Id.) In his opinion, she has "moderate limitations standing, walking, sitting, bending, lifting, and lying down because of pain in the back and the hips due to bursitis"; her allergies and migraine headaches "can interfere with her routine"; and she has allergies to multiple substances, which can cause "severe allergy [sic], including hives, congestion, and pain in multiple sites, and . . . sometimes . . . anaphylactic shock." (T.304). Dr. Toor concluded by stating that Plaintiff "should avoid lifting." (T.304).

-8-

### B.    Plaintiff's Testimony

Caternolo testified that she had her general equivalency degree and two years of community college. (T.43). She had had migraines her entire life but they were never properly diagnosed. (T.44). Eventually, the migraines began occurring every week, and her resultant absences from work led to her termination from her job as an one-on-one aide for a handicapped child with the Wayne County School District. (T.44). With the addition of Depakote to her medication regimen, she had been experiencing substantial relief from her migraines. The last migraine she had was in August 2010, after her aunt passed away. Stress is one of her triggers for migraines. (T.45).

Plaintiff described her symptoms from her degenerative disc disease as cramping, sharp, spasming pain in her buttocks that goes down her left leg. She is "completely unable to move" if she is "going through a back episode." (T.46). The osteoarthritis in her hips currently was causing her the "most exceeding pain" out of her various conditions. She needed to change positions while sitting or standing due to this pain. (T.46).

With regard to Caternolo's duties as a one-on-one aide, she explained that she changed her student's diapers, helped with her wheelchair, fed her, accompanied her on field trips, and facilitated school work within the classroom. (T.48). As Plaintiff's osteoarthritis progressed, she was totally unable to

lift her student and was required to obtain an assistant. (T.49). The job required her to sit for extensive periods of time and stay focused, and she "just was unable to do that with the pain." (Id.).

Plaintiff testified that her migraines increased in frequency and severity after she was moved to a new school in December 2008, because there was "particularly more stress with the transition." (T.48). With her increased stress, the migraines increased to the point where they were occurring weekly and she was missing two to three days of work. (Id.). She was placed on what she described as a warning or probation, and her principal indicated that they would revisit the issue in six months. (Id.). After the 6-month period, she was terminated in June 2009. (T.49).

While working at the school district, she also worked at Gus's Family Restaurant as a waitress. (T.50). She was required to do a lot of carrying and lifting of heavy items such as food trays and pickle buckets, and that "became impossible" because of her pain. (T.50). When asked what happened with that job, Plaintiff testified that her customers went to her boss and told him that they were "tired of watching [her] in pain" and "tired of watching [her] walk through the restaurant looking the way [she] did." (T.50). She was unable to lift her right leg, and at the end of the night, she would be in tears as she counted her tips. She often would wince in pain and cry out because when her hip went out, it was a "sharp pain like no other [she has] had before[.]" (Id.). The pain is

located between the curve of her pelvis and her right hip, and she has the same pain on the left side. (Id.).

When asked how often she experienced pain, she testified that it was "every day, every minute of every day." (T.51). To help relieve the pain she takes Tramadol, which "takes the edge off." (Id.). She is hoping to obtain a more effective treatment at the pain clinic, which she is going to start once she finishes physical therapy. (Id.). Besides the Tramadol, she uses a heating pad, which is "about all [she] really can do for it." (Id.).

Plaintiff also was diagnosed with depression in July 10, 2010, by her general practitioner, Dr. Miller, and has been taking Celexa with minimal improvement.[3] She said that does not want to go anywhere or do anything, and cannot sleep even though she is so exhausted from her other medical conditions. (T.53). She thinks her depression "mostly has to do with getting fired" and commented that her "spirit's crushed." (Id.). She has suggested to her doctors that she needs counseling, but she already has three or four appointments a week as it is. (T.54)

On questioning by her attorney, Caternolo indicated that her rheumatologist has suggested that she see an orthopedic surgeon for a second opinion about her hips because she has "some very strange qualities to [her] hips, like bursitis on both sides" which

---

[3]

Plaintiff expressly has stated that she is not alleging disability from a mental impairment.

"[m]akes sleeping impossible" because if she moves, she "jump[s] awake." (T.53).

Plaintiff has not driven since she had a concussion in July 2010, when she was getting out of her parents' boat. She was pulling herself up with her arms, when her right hip gave out, causing her to fall and slam her head into the dock. She had typical post-concussive symptoms and has been crying extensively ever since. She is seeing her neurologist about this as she still has a bump on her head and pain. (T.54).

Plaintiff explained in detail the side effects of her considerable medications, which include chronic, severe fatigue; dizziness; and dry mouth. She needs all of the medications in order to function, and they cause her to be extremely tired. (T.55). Plaintiff testified that she falls asleep every day during the afternoon for one or two hours. (T.56).

With regard to her family life, three of Plaintiff's five children still live at home, her twin 17-year-old girls and 10-year-old daughter. (T.56). She recently went to open house at their school, and it was "very challenging" because the handicapped ramp was not open. (T.56). She could not get up the stairs, and had to sit on her buttocks and "basically crawl" up the stairs. (T.57). This happens every time she has to climb stairs. (Id.).

When asked about her other problems at open house, she indicated that she was very nervous and felt upset having to return

the school district from which she had been fired. She stated that was traumatic to have to see "people . . . [who] didn't think [she] was sick." (T.57).

Plaintiff testified that she spends time with her daughters watching movies and reading books. (T.57). She helps prepare meals. She folds laundry but does not take the baskets up. (T.57).  She does not go grocery shopping alone; her companion comes with her and lifted all the bags. She prefers to use one of the scooters so people will keep more distance from her because she finds it difficult to pivot if she gets forced into a corner. (T.58). With regard to cleaning the house, she testified that her daughters, her companion, and she all help. (Id.).

### C.   Vocational Expert Testimony

Vocational expert Richard Smith, Ph.D. ("the VE") categorized Plaintiff's past work as a cleaner/housekeeper as light/unskilled (SVP[4] 2); her work as a waitress as light/semiskilled (SVP 4); and her work as a personal aide to a profoundly handicapped child as medium/semiskilled (SVP 4). (T.59).

The ALJ posited an individual of Plaintiff's age and with the same education and work experience "who's able to do light work,

---

[4]
"'SVP' stands for 'specific vocational preparation,' and refers to the amount of time it takes an individual to learn to do a given job." Urena-Perez v. Astrue, 06 CIV. 2589 JGK/MHD, 2009 WL 1726217, at *20 n.43 (S.D.N.Y. Jan. 26, 2009)(quotation omitted). "SVP uses a scale from 1 to 9 and the higher the SVP number the greater the skill required to do the job." Id. (citation omitted).

except the person is fairly limited" in the following ways: She requires the option to alternate between sitting and standing; no repetitive pushing or pulling bilaterally; no repetitive foot-control operations bilaterally; only occasional climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds; only occasional balancing, stooping, kneeling, crouching, bending or crawling; no repetitive reaching bilaterally; no concentrated exposure to operational control of moving machinery and unprotected heights; and no concentrated exposure to noise and chemicals. (T.60-61). According to the VE, there was semiskilled "sedentary work that allows [a] sit/stand option" Plaintiff could perform, but the ALJ clarified he wanted the difficulty level to be unskilled rather than semiskilled. (T.62).

According to the VE, such a person would be able to work as an "order clerk/food and beverage" (Dictionary of Occupational Titles ("DOT") 209.567-014), a job that was sedentary and unskilled at SVP 2. (T.62). Those positions were found in hotels, motels, and similar operations. (Id.). The VE also noted that "telephone quotation clerk" (DOT 237.367-046) fit the parameters of sedentary and unskilled work at SVP 2. (T.63). In the VE's opinion, that job had the option of sitting/standing, and was typically found in "any financial operation, insurance companies. . . mail order operation[s]. . . ." (T.63). There were over a million such jobs nationally, and 20,000 of those such jobs in the state of New York,

although most of them were in "the metropolitan area." (T.64). The VE described a third job, "surveillance system monitor" (DOT 379.367-010), of which there were 10,000 in New York State and over one million nationally. (Id.).

Plaintiff's attorney questioned the VE, positing first an individual with the same limitations as identified by the ALJ, but noting that Plaintiff had deficiencies in concentration and severe fatigue, necessitating a daily one-hour nap. (T.67). Plaintiff's attorney estimated that this would subtract one hour per day workday and five hours per week, meaning that Plaintiff would be off-task 20% of the time. (Id.). The VE did not know of any jobs a person would be able to sustain if she were off-task 20% of the time. (Id.).

## IV.  The ALJ's Decision

The ALJ applied the well-established five-step sequential evaluation to determine whether an individual is disabled as defined under the Act. See 20 C.F.R. § 416.920. First, the ALJ found that Plaintiff was not currently engaged in substantial gainful activity. At the second step, the ALJ found that Plaintiff has a combination of the following "severe impairments" which significantly limit her ability to do basic work activities: (1) migraine headaches, (2) degenerative disc disease of the lumbar spine; (3) bursitis of the hips; (4) osteoarthritis; (5) sciatica,

(6) seasonal allergies, (7) tobacco abuse disorder, and (8) irritable bowel syndrome. (T.19).

At the third step, the ALJ analyzed the medical evidence and found that Plaintiff did not have a listed impairment which would have rendered her disabled without consideration of vocational factors such as age, education, and work experience. Accordingly, the ALJ moved to the fourth step, which required asking whether Plaintiff has the residual functional capacity ("RFC") to perform her past work, notwithstanding her combination of severe impairments.

The ALJ concluded that Plaintiff retained the ability to perform light work[5], with a number of additional limitations that he specified in his hypothetical to the ALJ. (T.60-61). Plaintiff, therefore, could not perform her past work as a cleaner (light work), restaurant server (light work), and student aide (medium work) (T.25).

Because Plaintiff was unable to perform her past work, the ALJ proceeded to the fifth step, which is comprised of two parts.

-----

[5]

Light work involves lifting no more than 20 pounds at a time and having to frequently lift or carry objects weighing up to 10 pounds. A job is considered "light work" when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls. If an individual can do light work, she can do sedentary work, unless there exist additional limiting factors, such as loss of fine motor dexterity or inability to sit for extended periods of time. 20 C.F.R. §§ 404.1567(b), 416.967(b); see also Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *5 (S.S.A. 1983).

First, the ALJ assessed Plaintiff's job qualifications by considering her physical ability, age (41-years-old), education (high school equivalency degree and two years of college)and work experience (cleaner/housekeeper, waitress, and aide for a handicapped student). (T.25). The ALJ next determined whether jobs exist in the national economy that a person having her qualifications and RFC could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f). The ALJ found that Plaintiff's ability to perform all or substantially all of the requirements of light work had been impeded by additional limitations, although he did not provide a specific restriction on lifting. (T.25). Nevertheless, based upon the VE's testimony, the ALJ found that Plaintiff's limitations did not totally erode the unskilled light occupational base. (Id.). The ALJ adopted the VE's opinion testimony that Plaintiff was able to perform several jobs in the national economy, namely, food/beverage order clerk, telephone quotation clerk, and surveillance system monitor. (T.26).

## V.   General Legal Principles

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). When conducting a substantial evidence review, a court's responsibility is "'to

conduct a searching inquiry and to scrutinize the entire record, having in mind that the Social Security Act . . . is remedial in purpose.'" Monette v. Astrue, 269 F. App'x 109, 110 (2d Cir. 2008) (quoting McBrayer v. Secretary of Health & Human Servs., 712 F.2d 795, 798-99 (2d Cir. 1983)). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (quoting Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks omitted in Moran; other citations omitted)).

"Legal error" consists of incorrect determinations by the Commissioner on points of statutory or regulatory law. Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). In assessing a legal determination made by the Commissioner, "[the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal." Id. (internal quotation marks and citations omitted); accord, e.g., Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made

according to the correct legal principles." <u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987).

Upon concluding that the ALJ has committed legal error, the district court may either "(1) remand[ ] for reconsideration by the Commissioner upon the existing record or upon a record to be amplified, or (2) remand[ ] for calculation of benefits." <u>Balsamo v. Chater</u>, 142 F.3d 75, 82 (2d Cir. 1998). "Where the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate" because further findings would "plainly help to assure the proper disposition of the claim . . . ." <u>Butts v. Barnhart</u>, 388 F.3d 377, 385 (2d Cir. 2004). On the other hand, if remand would not serve this purpose, reversal is the more appropriate course of action. <u>Id.</u> at 385–86.

**V.   Discussion**

    **A.   Erroneous RFC Assessment**

        **1.   Legal Error in Analyzing Dr. Toor's Opinion**

Plaintiff contends that in determining her RFC, the ALJ "improperly picked and chose from [consultative examiner] Dr. Toor's opinion". Pl's Mem. at 12 (Dkt #8). Plaintiff asserts that the ALJ erroneously disregarded Dr. Toor's opinion that she should avoid lifting, and that "moderate" is too vague because it does not provide a ranges of weights she can lift or the frequency with which she can lift them.

Plaintiff is correct that"[i]t is a fundamental tenet of Social Security law that an ALJ cannot pick and choose only parts of a medical opinion that support his determination." Nix v. Astrue, No. 07-CV-344, 2009 WL 3429616, at *6 (W.D.N.Y. Oct. 22, 2009) (citing Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004) (citing Switzer v. Heckler, 742 F.2d 382, 385-86 (7th Cir. 1984)); accord, e.g., Correale-Englehart, 687 F. Supp.2d 396, 439 (S.D.N.Y. 2010). Plaintiff asserts that the ALJ improperly ignored Dr. Toor's opinion that she "should avoid lifting," a statement which she interprets as meaning that Dr. Toor is ruling out all lifting. Defendant urges the contrary meaning, contending that by "[s]tating that Plaintiff should avoid lifting," Dr. Toor "did not mean that Plaintiff was precluded from lifting." Defendant's Memorandum of Law ("Def's Mem.") at 26 (Dkt #11-1).

The Court rejects Defendant's overly technical, crabbed interpretation of "should avoid lifting". The meaning urged by Plaintiff is the more common sense, reasonable interpretation, especially in light of the record as a whole. Notably, Defendant fails to acknowledge that a specialist in this area of law, State disability analyst L. Maynard, construed Dr. Toor's comment as an "extreme" limitation on lifting.[6]

---

[6] Disability review analyst Maynard opined that the medical evidence of record did not support Dr. Toor's "extreme limit" of "avoid[ing] lifting. . . ." T.309. Maynard did not identify any medical evidence of record to support his opinion, instead asserting that Plaintiff "is able to do chores, childcare, shop,

The ALJ assigned parts of Dr. Toor's opinion "significant" weight, but he completely disregarded the portion of the report that would have led to a finding of disability by eroding Plaintiff's ability to do all light work. This was improper. See Robinson, 366 F.3d at 1083 ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.") (citation omitted).

### 2.   Error in Analyzing Dr. Miller's Opinion

Plaintiff argues that the ALJ erred in according "great" weight to Dr. Miller's report because he was unqualified to render a function-by-function assessment of her physical abilities. Plaintiff has offered no support for the proposition that Dr. Miller lacks the qualifications to opine on her limitations simply because he is a general practitioner and not an orthopedic specialist. However, the lack of continuity in his treatment of Plaintiff raises some concerns.

Although Dr. Miller practices at Williamson Medical, PLLC, where Plaintiff previously had received medical treatment, Dr. Miller did not establish a treating relationship with Plaintiff until 2010. At the time he completed his medical source statement

---

walks [sic] 1/2 mile before having to rest." (Id.). However, Plaintiff testified that she is only able to do chores and shopping with assistance in lifting. She is unable to perform childcare to the extent she did when she was a student aide for a handicapped child. Her own children are past the age where they need to be lifted. Finally, her ability to walk is irrelevant to an assessment of her lifting capabilities.

on June 24, 2010, had only seen her on one occasion. (T.315). Significantly, Dr. Miller determined the he lacked sufficient information to answer certain questions on the medical source report. See (T.315) (Dr. Miller noted that he was "unable to determine" how many hours Plaintiff could stand without interruption because "patient only seen once"); (T.316) (Dr. Miller noted that he was "unable to determine" how many hours Plaintiff could sit without interruption).

As an in initial matter, the ALJ again improperly picked and chose from a medical opinion, using only those parts that were favorable to a finding of nondisability. Dr. Miller's medical report was internally inconsistent insofar as he stated her pain was worsened by lifting, but nevertheless opined that she could "frequently" lift up to 10 pounds and "occasionally" lift up to 20 pounds.

Defendant argues that the ALJ properly assigned the greatest weight to Dr. Miller's report because he was her treating physician. "Whether the 'treating physician' rule is appropriately applied depends on 'the nature of the ongoing physician-treatment relationship." See Arnone v. Bowen, 882 F.2d 34, 41 (2d Cir. 1989) (quoting Schisler v. Heckler, 851 F.2d 43, 45 (2d Cir. 1988)). "The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a

complete and accurate diagnosis of his patient." <u>Mongeur v.</u>
<u>Heckler</u>, 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983). Because he only
had seen her on one occasion, however, Dr. Miller could not fulfill
the main function of a treating physician, that is, the provision
of a "detailed, longitudinal picture," 20 C.F.R. § 404.1527(c)(2),
of Plaintiff's impairments and resultant limitations. Dr. Miller's
knowledge of Plaintiff's case, at the time of his medical source
statement, was no greater than that of consultative examiner
Dr. Toor. Resort to the treating physician rule was not appropriate
here given the fact that Dr. Miller had only seen Plaintiff once.

### 3.   Lack of Substantial Evidence to Support the RFC

The ALJ determined that Plaintiff had the RFC to perform
"light work" with various limitations and restrictions, but the RFC
did not include any limitations on lifting beyond that which is
found in the definition of "light work" (being able to lift up to
20 pounds "occasionally" and up to 10 pounds "frequently", <u>see</u>
20 C.F.R. §§ 404.1567(b), 416.967(b)).

The physical portion of the ALJ's RFC determination is flawed
in several ways. First, the ALJ's error in assessing Dr. Toor's
opinion, discussed above, was compounded by error in evaluating the
opinion of Dr. Miller. (T.24). As noted above, Dr. Miller had only
seen Plaintiff once and therefore could not answer all of the
questions. See <u>Outley v. Astrue</u>, No. 5:09-CV-0141 (FJS/VEB), 2010

WL 3703065, at *4 (N.D.N.Y. Aug. 26, 2010) (finding that the physical portion of the ALJ's RFC determination was not supported by substantial evidence because the ALJ failed to fully develop the record and failed to obtain any medical source statements).

Second, the ALJ also failed to consider the side effects of Plaintiff's various medications in determining her RFC. Plaintiff takes gabapentin for her post-herpectic neuralgia, which causes dizziness,[7] sleepiness, memory loss, as well as dry mouth, diarrhea, and hair loss. (T.55). She takes Depakote for her migraines, which also causes drowsiness, as well as tremors in her hands and legs, dry mouth, and dry eyes. (Id.). For her back and hip pain, she takes Tramadol, which induces significant drowsiness. (Id.). Plaintiff gets sleepy in the afternoon every day, and she naps for approximately one to two hours.

The pharmaceutical literature[8] indicates that the medications used by Plaintiff reasonably can cause the side-effects she describes. Tramadol, an opiate agonist used to relieve moderate to moderately severe pain, can cause, among other things, dizziness, weakness, drowsiness, and sleepiness. Depakote (valproic acid) is used prevent migraine headaches, but not to relieve headaches that have already begun. It is an anticonvulsants and can cause, among

---

[7]    Plaintiff had a dizzy spell during the administrative hearing.

[8]    See http://www.nlm.nih.gov/medlineplus/druginfo/meds/ (last accessed Apr. 24, 2013).

other things, drowsiness, dizziness, headache, and uncontrollable shaking in parts of the body. Gabapentin, also an anticonvulsant, is used to relieve the pain of post-herpetic neuralgia. Its side effects include drowsiness, tiredness, weakness, dizziness, and memory problems.

There is no indication in the ALJ's decision that he considered the extensive side effects of Plaintiff's various medications. Had he properly accounted for them in formulating the RFC, Plaintiff would not have been able to perform any jobs in the national economy. As discussed above, the VE testified that a person with Plaintiff's concentration deficits and chronic somnolence during the day would not be able to sustain any type of substantial gainful employment.

**B.   Erroneous Assessment of Plaintiff's Subjective Complaints**

Plaintiff contends that the ALJ did not give proper consideration to her allegations of pain and side effects, and erroneously found her not credible.

In assessing a claimant's subjective complaints of pain, the ALJ first must determine whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the pain alleged. 20 C.F.R. § 416.929(b). Second, the ALJ must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's pain contentions are not

substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry. See Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003) (summary order). "Evidence of pain is an important element in the adjudication of . . . SSI claims, and must be thoroughly considered in calculating the RFC of a claimant." Meadors v. Astrue, 370 F. App'x 179, 183 & 184 n.1 (2d Cir. 2010) (summary order) (citation omitted); see also 20 C.F.R. § 416.945; SSR 96-7p, 1996 WL 374186, at *2-*3 (S.S.A. July 2, 1996). When finding a claimant not entirely credible, the ALJ must include in his decision "specific reasons for the finding on credibility, supported by the evidence in the case record . . . ." SSR 96-7P, 1996 WL 374186, at *4 (S.S.A. 1996).

Here, the ALJ found that although Plaintiff had medically determinable impairments that reasonably could be expected to produce the alleged symptoms, her testimony concerning the intensity, persistence, and limiting effects of her pain were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (T.24). The Court has found no support in the regulations or the caselaw from this Circuit supporting the propriety of basing a credibility determination solely upon whether the ALJ deems the claimant's allegations to be congruent with the ALJ's own RFC finding. See, e.g., Smollins v. Astrue, No. 11-CV-424, 2011 WL 3857123, at *11 (E.D.N.Y. Sept. 1, 2011) ("[The ALJ's] analysis of Smollins's

credibility is flawed not only in its brevity, but also in its acceptance as a foregone conclusion of Smollins's capacity to perform sedentary work. Instead of comparing Smollins's symptoms, as described by Smollins herself and her doctors, to the objective medical and other evidence of record as required by the Social Security regulations, [the ALJ] merely compared Smollins's statements regarding her symptoms to his own RFC assessment."); see also Mantovani v. Astrue, No. 09-CV-3957, 2011 WL 1304148, at *5 (E.D.N.Y. Mar. 31, 2011) (similar).

"The assessment of a claimant's ability to work will often depend on the credibility of her statements concerning the intensity, persistence and limiting effects of her symptoms." Otero v. Colvin, 12-CV-4757, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013). Id. Thus, it is not logical to decide a claimant's RFC prior to assessing her credibility. Id. To use that RFC to discredit the claimant's subjective complaints merely compounds the error. Id. Indeed, the Seventh Circuit has specifically rejected the boilerplate language used by this ALJ noting that it "implies that ability to work is determined first and is then used to determine the claimant's credibility." Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012).

In addition to this error, the ALJ misapplied Second Circuit law when he determined that "the record does not support . . . [Plaintiff's] contention that she cannot work" as she "testified

that she is largely independent in her activities of daily living despite her pain." (T.24). As Plaintiff correctly notes, however, "'a claimant need not be an invalid to be found disabled.'" Balsamo v. Chater, 142 F.3d at 81 (rejecting subjective pain complaints of plaintiff, a former policeman, because he was "not homebound", he "own[ed] and operate[d] a motor vehicle when required", and he "continue[d] to carry a gun") (citing Williams v. Bowen, 859 F.2d 255, 260 (2d Cir. 1988) ("'[A] claimant need not be an invalid to be found disabled under Title XVI of the Social Security Act.'") (quoting Murdaugh v. Secretary of Health and Human Servs., 837 F.2d 99, 102 (2d Cir. 1988) (citation omitted)); other quotation in Balsamo omitted)).

"A claimant's participation in the activities of daily living will not rebut his or her subjective statements of pain or impairment unless there is proof that the claimant engaged in those activities for sustained periods of time comparable to those required to hold a sedentary job." Polidoro v. Apfel, No. 98 CIV.2071(RPP), No. 98 Civ.2071(RPP), 1999 WL 203350, at *8 (S.D.N.Y. 1999) (citing Carroll v. Secretary of Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983) (finding that the Secretary failed to sustain his burden of showing that plaintiff could perform sedentary work on the basis of (1) his testimony that he sometimes reads, watches television, listens to the radio, rides buses and subways, and (2) the ALJ's observation that plaintiff

"'sat still for the duration of the hearing and was in no evident pain or distress'" because "[t]here was no proof that Carroll engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job")). The ALJ here failed to specify which of Plaintiff's "activities of daily living" demonstrate that she is capable of working on a regular and continuing basis (8 hours a day, for 5 days a week, or the equivalent). See SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996).

Indeed, contrary to the ALJ's passing observation, Plaintiff's testimony regarding her abilities indicates that she is not "largely independent" in her daily living activities. When doing laundry, Plaintiff "do[es] not take the baskets up" and that when grocery shopping, "[a]ll [the] bags are lifted by somebody else." (T.57-58). Plaintiff also testified that she is "unable to move if [she is] going through a back episode" and that stress exacerbates her migraine headaches. (T.46, 48). Notably, the clinical observations by Dr. Toor, Dr. Miller, and Dr. Whitbeck substantiate Plaintiff's complaints of pain. Dr. Toor noted that Plaintiff was in pain during the consultative examination and needed assistance getting on and off the table. Dr. Miller stated that Plaintiff's pain was worsened by lifting. Dr. Whitbeck found that "on exam [she has] signs of intrinsic pathology" warranting an assessment of low back pain, bilateral sciatica, and bilateral hip pain. (T.289).

"While the ALJ is not obligated to 'reconcile explicitly every conflicting shred of medical testimony,' he cannot simply selectively choose evidence in the record that supports his conclusions." Gecevic v. Secretary of Health and Human Servs., 882 F. Supp. 278, 286 (E.D.N.Y. 1995) (quoting Fiorella v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983) (citations omitted)). That is what the ALJ did here, and the error is not harmless under the circumstances of this case. See Rodriguez v. Astrue, No. 12-CV-4103, 2013 WL 1282363, at *16 (E.D.N.Y. Mar. 28, 2013) (rejecting ALJ's finding of inconsistencies in plaintiff's testimony where ALJ found that she "is essentially independent in personal care," as she "prepares meals daily, which takes 45 minutes to 1 1/2 hours" and "can do some household chores with assistance, and shops for groceries"; ALJ erroneously failed to mention that Rodriguez also stated that she usually receives assistance when grocery shopping, and often has to stop and rest while preparing simple meals") (internal citations omitted).

In addition to ignoring the significant side-effects caused by Plaintiff's medications on her abilities to perform work-related functions, the ALJ mischaracterized the record by implying that her failure to go to a pain clinic meant that her pain was not as severe as she described. (T.21). Plaintiff testified, however, that her doctors had first directed her to finish physical therapy and consultation with the surgeon, and then "[they] can start on that

road." (T.51). Dr. Whitbeck corroborated this by noting as of June 25, 2009, she had "never been referred to a pain clinic." (T.288). Surely Plaintiff cannot be expected to seek treatment at a pain clinic that has not yet been prescribed by her doctors. It was plainly improper for the ALJ to reject Plaintiff's testimony in reliance upon his misstatement of the record. See Aragon-Lemus v. Barnhart, 280 F. Supp.2d 62, 70 (W.D.N.Y. 2003) (finding the ALJ's credibility analysis not supported by substantial evidence in part because the ALJ mischaracterized the plaintiff's testimony); see also Edel v. Astrue, No. 6:06-CV-0440 LEK/VEB, 2009 WL 890667, at *17 (N.D.N.Y. Mar. 30 2009) (similar).

## C.   Errors in the Step Five Determination

Plaintiff argues that substantial evidence does not support the ALJ's Step Five determination, which also is legally erroneous. At Step Five, the burden shifts to the Commissioner to show, based on the RFC determination made at Step Four, there is work existing in the national economy that the claimant can do; the ALJ need not provide additional evidence of the claimant's RFC. Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (citing 20 C.F.R. § 404.1560(c)(2)).

Here, the ALJ's Step Five determination necessarily was flawed because it was based upon an RFC marred by errors as described above. First, the ALJ improperly picked and chose conclusions from Dr. Miller's report without regard as to whether they were

consistent with the record as a whole and consistent with Dr. Toor's limitation on Plaintiff's ability to lift. Dr. Miller was the only doctor who completed a function-by-function assessment of Plaintiff, yet he was unable to answer some of the questions because he had only seen Plaintiff on one occasion. Second, the ALJ improperly evaluated Plaintiff's credibility *after* determining her RFC in that he stated that Plaintiff's complaints were only credible to the extent they were consistent with his RFC determination. See Bjornson, 671 F.3d at 645-46. Third, the ALJ essentially ignored Plaintiff's subjective complaints regarding her pain and the significant side effects of her medications.

Based upon these errors, the RFC formulated by the ALJ was not supported by substantial evidence. It follows that the ALJ's hypotheticals posed to the VE, based as they were on an erroneously RFC, necessarily were flawed in a similar fashion. The VE's opinion that there are jobs existing in the national economy that Plaintiff can perform rests upon multiple errors. The ALJ's determination at Step Five of the sequential analysis thus is erroneous, both as a matter of fact and of law.

### D. Failure to Develop the Record

Plaintiff argues that the ALJ disregarded his obligation to develop the record by failing to seek an opinion on Plaintiff's function-by-function limitations from Dr. Kaempffe. Defendant

argues that the record was complete, and therefore the ALJ was not required to recontact Dr. Kaempffe.

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted). This duty, however, is not without limit. If all of the evidence received is consistent and sufficient to determine whether a plaintiff is disabled, further development of the record is unnecessary, and the ALJ may make his determination based upon that evidence. See 20 C.F.R. § 416.920b(a).

Dr. Kaempffe saw Caternolo for her bilateral hip osteoarthritis on three occasions over a period of three weeks in the summer of 2009, and provided intra-articular steroid injections in both hips under local anaesthesia. (T.293). At the August 4th visit, Dr. Kaempffe indicated that Caternolo could "resume activities as tolerated" and would be seen in follow-up in six to eight weeks. (T.293). On August 17, 2009, Dr. Kaempffe noted that there had been "slight improvement" since the last visit. (T.295). Caternolo "continue[d] to walk and exercise[,]" although on examination, she ambulated with a limp and experienced pain with extremes of hip motion. (T.295). In closing, Dr. Kaempffe noted, "[t]he patient may work without restrictions and will be seen in 4 weeks for follow up . . . ." (T.295). At the time, Plaintiff had

-33-

not been working for two months, having lost her job due to absences caused by her debilitating migraines. Therefore, it is unclear why Dr. Kaempffe issued an opinion on this point.

Dr. Kaempffe only saw Plaintiff for the limited purpose of providing steroid injections over the course of three weeks in the summer of 2009. The short duration and limited scope of his consultation with Plaintiff, and the fact that his examination of her is relatively remote in time, indicate to the Court that a medical source statement from Dr. Kaempffe was not necessary to complete the record. Therefore, the ALJ is not required to contact Dr. Kaempffe to obtain a medical source statement.

## VI.  Disposition

Reversal without remand is appropriate when there is "persuasive proof of disability" in the record and further proceedings would be of no use. Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).  As detailed above, the ALJ committed several legal errors at critical stages of the disability analysis and ignored, without explanation, substantial evidence of disability. Only by selectively reading Dr. Toor's and Dr. Miller's reports and by discounting Plaintiff's credible complaints of pain and debilitating side effects could the ALJ arrive at an RFC that allowed him to find Plaintiff capable of light work with restrictions. Remand solely for the calculation of benefits is appropriate where, as here, "application of the correct legal

principles to the record could lead to only one conclusion," DeJesus v. Chater, 899 F. Supp. 1171, 1179 (S.D.N.Y. 1995), namely, that is, Plaintiff is disabled for purposes of the Act.

## VII. Conclusion

For the reasons discussed above, Defendant's Motion for Judgment on the Pleadings is denied, and Plaintiff's Motion for Judgment on the Pleadings is granted. The Commissioner's decision is vacated, and the matter is reversed and remanded solely for calculation and payment of benefits.

**ALL OF THE ABOVE IS SO ORDERED.**

s/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     April 29, 2013
           Rochester, New York